**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**ANGELA MARIE KUKULOFF,**

      **Plaintiff,**

**v.**                            **Case No.: 3:17-cv-04624**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 9, 10).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On April 21, 2014, Plaintiff Angela Marie Kukuloff ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of January 1, 2014 due to back problems and anxiety. (Tr. at 217-20, 259). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 122-31, 137-42). Claimant then filed a request for an administrative hearing, which was held on October 13, 2016 before the Honorable Boyce Crocker, Administrative Law Judge. (Tr. at 34-77). By written decision dated November 4, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 14-33). The ALJ's decision became the final decision of the Commissioner on October 25, 2017 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 9, 10). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 28 years old on her alleged onset date and 30 years old on the date of the ALJ's decision. (Tr. at 27). Claimant obtained a general education diploma and attended less than one year of college. (Tr. at 39). She previously worked as a youth services worker, in-home caregiver, janitor, cashier clerk, and construction worker. (Tr.

at 71).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent

3

the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is

not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2018. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 2014, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: spine disorder, affective disorder, and anxiety disorder. (*Id.*, Finding No. 3). The ALJ considered Claimant's reported seizure disorder but found the impairment to be non-severe. (*Id.*, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an

impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a limited range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally lift and carry ten pounds; frequently lift and carry less than ten pounds; sit for six hours in an eight hour day; stand and walk for two hours in an eight hour day; push and pull up to weight limits; she can occasionally reach overhead with the upper extremities, bilaterally; occasionally climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; occasionally balance, stoop or crouch; and never kneel or crawl; she should never work around unprotected heights, moving mechanical parts or extreme cold and she should avoid concentrated exposure to vibration. Due to mental impairments, the claimant can understand, remember and [carry out] instructions; she is limited to performing simple, routine tasks; she can use judgment; she is limited to performing simple, work-related decisions; she can frequently respond appropriately to supervisors and co-workers; occasionally respond appropriately to the public; and she can deal with changes in the work setting.

(Tr. at 21-25, Finding No. 5). At the fourth step, the ALJ determined that Claimant could not perform any of her past relevant work. (Tr. at 26-27, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 27-28, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1985 and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 27, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including

unskilled sedentary work as an inspector and sorter. (Tr. at 27-28, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 28, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ erroneously evaluated the severity of Claimant's physical and mental impairments; as a result, the ALJ found Claimant capable of performing a limited range of sedentary work when, in truth, she was incapable of substantial gainful activity on any level on a sustained and consistent basis. (ECF No. 9 at 5). In support of this argument, Claimant cites to several medical records detailing her spinal disorder and its associated symptoms. (*Id.* at 5-6).

Claimant also contends that the ALJ failed to consider how Claimant's mental impairments further reduced the unskilled sedentary occupational base despite the emphasis placed on that issue in Social Security Ruling 96-9p ("SSR 96-9p"). (*Id.* at 6). Claimant argues that given the evidence of her anxiety and affective disorder, the ALJ should have ordered a consultative examination to ascertain the severity of her mental impairments and their impact on her ability to work. (*Id.* at 6-7). Claimant further states that the ALJ should have accepted the opinions of the vocational expert, who testified at the administrative hearing that there were not any jobs that someone with Claimant's RFC could perform if the individual were absent from work more than one day per month and/or off-task for ten percent or more of the work day. (*Id.*).

In response to Claimant's challenges, the Commissioner asserts that the ALJ fully considered the medical evidence in this case. (ECF No. 10 at 15). The Commissioner notes that no treating or examining physician found that Claimant had greater limitations than the ALJ included in the RFC assessment. (*Id.*). In fact, the Commissioner cites that

Claimant's treating physician, Katherine Steele, M.D., documented in the clinical record that she refused to write a letter stating that Claimant was unable to work because Dr. Steele believed that Claimant could indeed work notwithstanding her low back pain. (*Id.*). The Commissioner asserts that the ALJ's RFC finding explicitly compensated for any limitations related to Claimant's spinal impairment because the RFC finding restricted Claimant to less than a full range of sedentary work. (*Id.*). Furthermore, the Commissioner notes that the ALJ's RFC finding was more restrictive than any of the state agency opinions offered in this matter. The ALJ gave Claimant the benefit of the doubt and considered the record as a whole, including additional evidence submitted subsequent to the agency opinions. (*Id.*). Furthermore, the Commissioner emphasizes that the ALJ's RFC assessment considered Claimant's allegations of pain, the relatively benign diagnostic testing results, and the fact that Claimant was not taking her medications as prescribed. (*Id.* at 16).

In terms of Claimant's mental impairments and SSR 96-9p, the Commissioner states that there was no evidence that Claimant suffered a substantial loss of basic work-related mental abilities on a sustained basis. To the contrary, the evidence established that Claimant's mental symptoms were minimal and responded well to medication. (*Id.* at 17). Further, the Commissioner notes that the ALJ generously accounted for Claimant's mental limitations by restricting her to simple, routine tasks and simple work-related decisions. (*Id.* at 18). Finally, as to Claimant's argument that the ALJ should have accepted the vocational expert's testimony that a person with Claimant's characteristics could not work if the person were absent or off-task over a certain threshold, the Commissioner asserts that the testimony was not relevant because the record did not support that Claimant would be absent more than one day per month and/or off-task for

8

ten percent or more of the work day. (*Id.*). The Commissioner argues that for all of the above reasons and in light of the very deferential standard of review that the Court must apply in reviewing the agency's social security decision, the Court should affirm the Commissioner's decision in Claimant's case. (*Id.* at 19).

## V.    Relevant Evidence

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. Treatment Records

On December 31, 2013, Claimant was in a motor vehicle accident on her way to work. (Tr. at 344). She complained of increased low back pain and underwent a physical therapy evaluation the following month on January 31, 2014. (Tr. at 397). The findings were consistent with post lumbar derangement, and Claimant was adjudged to have good rehabilitation potential. She was scheduled for six weeks of physical therapy at a rate of three sessions per week. (Tr. at 398-99). At Claimant's physical therapy session on March 7, 2014, she reported constant pain that she rated ten on a ten-point scale. (Tr. at 418). Claimant did not have any increased pain throughout her session and showed no evidence of total pain through her facial expressions or complaints. (Tr. at 419). However, Claimant did not report any decrease in pain after the treatment. After completing seven of the eighteen ordered sessions, Claimant ceased attending her physical therapy appointments. On April 10, 2014, she was discharged from physical therapy for failing to appear at the last five appointments. (Tr. at 421).

On March 20, 2014, Claimant's lumbar spine was x-rayed. (Tr. at 396). Her results were stable when compared to the previous study taken on the day of her car accident. (*Id.*). Claimant still had only mild levoscoliosis and mild disc space loss in her L4-L5 and

9

L5-S1 spinal segments. (*Id.*). The following month, on April 2, 2014, Claimant presented to Kimberly Renee Becher, M.D., a resident physician with Marshall Health, to establish a primary care provider. (Tr. at 336). Regarding Claimant's medical history, Dr. Becher noted that Claimant suffered a back injury that initially caused throbbing and stabbing low back pain and that subsequent diagnostic testing revealed herniated discs in Claimant's lumbar spine at L2-L4. (*Id.*). Claimant expressed worsening symptoms, including heaviness in her left leg, constant tingling and numbness in the lateral portion of her left leg below the knee, and throbbing in the left leg above the knee. (*Id.*). Claimant stated that she was unable to stand for more than ten minutes at one time and she received no relief from physical therapy. Claimant also reported that she was "feeling down" and had a hard time controlling her anger now that she was forced to be sedentary. (*Id.*). On examination, Claimant had decreased sensation in her left foot and left lateral calf and had no deep tendon reflexes on the left side. (Tr. at 338). Dr. Becher concluded that there was no need to complete the straight leg raising test because Claimant was already in pain while sitting, laying, and standing. (*Id.*). Dr. Becher diagnosed Claimant with lumbar radiculopathy, obesity, and nicotine dependence. (Tr. at 338-39). She planned to obtain an MRI of Claimant's back and refer her to a neurosurgeon. (Tr. at 339). Dr. Becher prescribed Celexa and advised Claimant to stop smoking in case she required surgical intervention for her back pain. (*Id.*).

Claimant's lumbar spine MRI was performed later that month on April 29, 2014. (Tr. at 348). Claimant had small disc protrusions in her lumbar spine at L4-L5 and L5-S1, but she did not have significant stenosis anywhere in her spine. (Tr. at 349). In her L4-L5 spinal segment, Claimant had mild central canal stenosis, no significant foraminal narrowing, and mild facet degenerative changes. In her L5-S1 spinal segment, Claimant

had disc desiccation with a minimal left foraminal/far lateral broad-based protrusion. (*Id.*).

On May 5, 2014, Claimant saw neurosurgeon, Terrence D. Julien, M.D., concerning lumbar radiculopathy. (Tr. at 344). Claimant again reported that her pain was ten on a ten-point point scale. (*Id.*). Claimant's gait was antalgic, and she exhibited tenderness in her lumbosacral spine, as well as muscle spasms on the left side of her lumbosacral spine. (Tr. at 346). Lateral flexion and rotation of Claimant's lumbar spine was restricted and painful. Claimant's straight leg raising test was positive. (*Id.*). Claimant's sensation was also diminished in her entire left leg; her right ankle jerk was low normal/diminished on the right; she showed a positive Romberg sign;[1] and her scapulohumeral reflex was absent.[2] (*Id.*). However, Claimant had no ankle clonus,[3] Hoffman's sign,[4] or Babinski reflex.[5] (*Id.*). Dr. Julien referred Claimant to a pain clinic for epidural steroid injections. (Tr. at 349).

---

[1] "The Romberg test is used for the clinical assessment of patients with disequilibrium or ataxia from sensory and motor disorders ... In the Romberg test, the patient stands upright and asked to close his eyes. A loss of balance is interpreted as a positive Romberg sign." https://www.physio-pedia.com/Romberg_Test

[2] A scapulohumeral reflex is "a normal response to tapping the vertebral border of the scapula, resulting in adduction of the arm. Absence of the reflex may indicate a lesion in the region of the fifth cervical segment of the spinal cord." https://medical-dictionary.thefreedictionary.com/scapulohumeral+reflex

[3] Ankle clonus is a "rhythmical, sustained series of flexion movements at the ankle. This is produced in people with damage to the nerve pathways in the spinal cord or brain (an upper motor neurone lesion), by a deliberate rapid, stretching of the Achilles tendon, by forcibly flexing the foot. The spinal reflex arc is intact but the normal control on it, from above, is defective."https://medical-dictionary.thefreedictionary.com/ankle+clonus

[4] "Hoffman's sign or reflex is a test that doctors use to examine the reflexes of the upper extremities ... to test for the possible existence of spinal cord compression from a lesion on the spinal cord or another underlying nerve condition." https://www.medicalnewstoday.com/articles/322106.php

[5] "The Babinski reflex occurs after the sole of the foot has been firmly stroked. The big toe then moves upward or toward the top surface of the foot. The other toes fan out ... When the Babinski reflex is present in a child older than 2 years or in an adult, it is often a sign of a central nervous system disorder. The central nervous system includes the brain and spinal cord." https://medlineplus.gov/ency/article/003294.htm

On May 14, 2014, Claimant saw Dr. Becher for management of multiple medical problems. (Tr. at 322). Claimant complained of pain in her lumbar and sacral regions, as well as numbness in her left thigh and buttocks, extending down her left leg into her foot. (*Id.*). Claimant stated that her back pain was worsening and was now spreading up and down her spine. (*Id.*). She reported that the pain was worse when she dorsiflexed her foot and asserted that she had two falls since her last visit. (*Id.*). Claimant complained that Ultram was no longer controlling her pain, and she requested more pain medication. (*Id.*). Claimant also stated that her anxiety was not improving and she requested an increase in Celexa. (Tr. at 323). On examination, Claimant had tenderness along her lumbar spine, a positive straight leg raising test on the left, decreased sensation in her left lateral thigh, and an antalgic gait. (Tr. at 325). Dr. Becher prescribed Claimant an opioid pain medication, Norco, and a muscle relaxer for treatment of pain until Claimant could get an appointment with a pain clinic. (Tr. at 325). Dr. Becher also increased Claimant's dosage of Celexa. (*Id.*). Later that month, on May 21, 2014, EMG nerve conduction studies were performed on both of Claimant's lower extremities and the results were normal. (Tr. at 341).

On July 1, 2014, Claimant's primary care at Marshall Health was transferred from Dr. Becher to another resident physician, Katherine Steele, M.D. (Tr. at 325, 477).  At the initial visit with Dr. Steele, Claimant reported that she was now taking Effexor and it was "somewhat" helping her depression, but she felt irritable all of the time. Regarding her back pain, Claimant stated that Norco took "the edge off," but she had numbness and tingling in her left leg. (*Id.*). Claimant was tender to palpation in her paraspinal lumbar area and she reported decreased sensation in her L4-L5 nerve distribution area. (Tr. at 480). For depression, Claimant was continued on Effexor and referred for counseling.

(Tr. at 481). Dr. Steele renewed Claimant's Norco for back pain and additionally prescribed Neurontin for neuropathic pain. (*Id.*).

On December 2, 2014, Claimant followed up with Dr. Steele. Claimant claimed that her back pain was worsening and she now felt pain extending up her spine and numbness in her left leg and foot. (Tr. at 462). On examination, Claimant was noted to have an antalgic and limping gait on her left side. (Tr. at 465). Muscle spasms were palpated along the length of Claimant's spine on the left side. (*Id.*). Claimant's straight leg raising test was positive on the left; her muscle strength was 4 out of 5 in her left leg; her patellar reflex was 3+ on the left; and she reported numbness in her left lateral thigh to the anterior of her left leg in the L5 nerve distribution. (*Id.*). Dr. Steele prescribed Flexeril for Claimant's back spasms, ordered an MRI for Claimant's left leg numbness and tingling, renewed Claimant's Norco, and increased Claimant's Neurontin for her lumbar radiculopathy. (Tr. at 466-67). Claimant's repeat lumbar spine MRI was taken later that month on December 23, 2014. The test showed a stable subligamentous bulging or protruding disc as L4-L5, but no extruded disc material, no focal disc herniation at L5-S1, and no enhancing lesions. (Tr. at 458).

On February 2, 2015, Claimant again saw Dr. Steele. Claimant complained of weakness in her left arm and shoulder pain when she reached behind her back or moved suddenly. (Tr. at 447). Claimant remembered feeling/hearing a "pop" when she reached behind her seat in her truck. (*Id.*). Claimant also complained of anxiety episodes. (*Id.*). In terms of her chronic low back pain, Claimant felt that her dosage of Norco was enough to control the intensity of her pain, but stated that the medication did not last long enough. She admitted that she would take an extra pill during the day, which sufficiently controlled her pain. (*Id.*). Claimant's assessed conditions included shoulder pain, anxiety,

13

muscle strain, lumbar radiculopathy, nicotine dependence, and obesity. (Tr. at 450). Dr. Steele planned to x-ray Claimant's shoulder but surmised that the shoulder pain was likely a muscle strain. (Tr. at 451). Dr. Steele prescribed a non-steroidal anti-inflammatory drug and continued Claimant on the muscle relaxant Flexeril. (*Id.*). For Claimant's generalized anxiety disorder/post-traumatic stress disorder, Dr. Steele prescribed Zoloft because Claimant had not tolerated Effexor or Celexa in the past. (*Id.*). Dr. Steele also recommended that Claimant seek mental health treatment. (*Id.*). Finally, for Claimant's low back pain, Dr. Steele increased the frequency of Claimant's Norco prescription from three times per day to every six hours. (*Id.*); (Tr. at 451).

Claimant followed up with Dr. Steele again on July 23, 2015. Claimant stated that she was taking Norco as prescribed, but that it was not helping her chronic low back pain. (Tr. at 433). Claimant stated that she stayed in bed all day and could not function. (*Id.*). Her husband was also present at the appointment and was adamant that Claimant's pain was very severe and prevented Claimant from functioning. (*Id.*). Claimant requested a letter from Dr. Steele stating that Claimant could not work due to her pain. (*Id.*). Claimant told Dr. Steele that her previous primary care provider, Dr. Becher, wrote a letter to that effect. (*Id.*). However, Dr. Steele found no such letter in Claimant's records and stated that she would not write a letter advising that Claimant could not work because it was her opinion that Claimant could work with her low back pain. (*Id.*). On examination, Claimant was tender to palpation along her right paraspinal muscles from her mid-thoracic spine down to her sacral area;, she had a positive straight leg raising test on her right side by raising her left leg; and she had decreased sensation throughout her L5-S1 dermatomal nerve distribution. (Tr. at 437). However, Claimant had full range of motion in her hips, was fully oriented, and had a normal mood and affect. (*Id.*). Dr. Steele diagnosed Claimant

14

with narcotic drug use, gastroesophageal reflux disease, gastritis, and lumbar radiculopathy. (*Id.*). Dr. Steele stated that she had no doubt that Claimant had low back pain given the fact that Claimant was limping and had significant muscle spasms on the right, which was likely to compensate for her left-sided back pain. (Tr. at 438). Dr. Steele referred Claimant to physical therapy and refilled Claimant's Norco, but noted that she had a "high suspicion" that Claimant was not taking it as directed. (Tr. at 438). Thus, Dr. Steele ordered a urine drug screen. (*Id.*). Dr. Steele also continued Claimant on Aleve, Flexeril, and Neurontin. (*Id.*). Dr. Steele also noted that Claimant had an adjustment disorder with depressed mood and anxiety. (Tr. at 429, 431).

On July 28, 2015, Dr. Steele wrote a letter advising Claimant that her most recent urine test was negative for Norco, which Dr. Steele regularly prescribed for Claimant's chronic low back pain. On the other hand, Claimant's urine screen was positive for benzodiazepines and marijuana, which were not prescribed by Dr. Steele, nor documented as being filled by Claimant in Claimant's Board of Pharmacy report. (Tr. at 424). Therefore, due to Claimant's non-compliance with the medications prescribed by Dr. Steele and her use of other controlled substances, Dr. Steele stated that she would not provide Claimant with any further narcotics or controlled substances. (*Id.*).

On August 13, 2015, Claimant saw physician's assistant Deborah Allen at the Marshall Health Neurosurgery Clinic regarding her back pain. (Tr. at 490). Claimant stated that she had an occasional burning sensation in her back and her back pain intermittently radiated into her left leg and caused numbness and tingling. (*Id.*). Claimant stated that Aleve helped "some" and that Neurontin helped her back and leg pain, but that Flexeril and Norco did not "help much." (*Id.*). On examination, Claimant had diffuse tenderness to palpation in her low back paraspinal muscles, but she did not have any point

15

tenderness. (Tr. at 491). Claimant's straight leg raising test was negative bilaterally; her gait was normal and tandem; her reflexes were normal throughout her upper and lower extremities, except for her Achilles, which was +1; no clonus was noted; she had normal muscle tone and strength; and her sensation to touch was intact. (Tr. at 491). Ms. Allen stated that she reviewed Claimant's MRI with neurosurgeon, Robert Marsh, M.D., Ph.D., and discussed Claimant's treatment plan. (*Id.*). Claimant was referred to a pain clinic. If her pain did not improve, Claimant could return to the neurosurgery clinic for further evaluation by Dr. Marsh. (*Id.*).

On December 15, 2015, Claimant saw Dr. Marsh after she was denied treatment at the pain clinic because its services were not covered by her insurance provider. (Tr. at 487). Claimant had the same complaints as were expressed at her earlier appointment, and her physical examination again showed diffuse tenderness to palpation in her low back paraspinal muscles, but no point tenderness. (Tr. at 488). Claimant's straight leg raising test was still negative bilaterally; her gait was normal and tandem; her reflexes were normal throughout her upper and lower extremities, except for her Achilles, which was +1; she had normal muscle tone and strength; and her sensation to touch was intact. (Tr. at 488-89). Dr. Marsh stated that Claimant's physical examination was not significantly different than when Claimant was last seen at the clinic "other than the lack of effort." (Tr. at 489). He prescribed Flexeril for Claimant's muscle spasms, ordered physical therapy for Claimant's low back pain, and stated that Claimant's lumbar spine MRI would be repeated, if Claimant did not improve, to assess whether her pathology had changed. (*Id.*).

### B. Evaluations and Opinions

On May 31, 2014, state agency psychologist Debra Lilly, Ph.D., evaluated

Claimant's mental impairments based upon her review of Claimant's records. Dr. Lilly found that Claimant had non-severe affective and anxiety-related disorders that only mildly restricted her ability to perform activities of daily living; maintain social functioning; and maintain concentration, persistence, or pace. (Tr. at 83-84). Paula J. Bickham, Ph.D., affirmed this assessment on November 13, 2014. (Tr. at 104).

On June 4, 2014, Dominic Gaziano, M.D., assessed Claimant's physical impairments based upon his review of her medical records. Dr. Gaziano opined that Claimant could perform work at the light exertional level and could stand and/or walk for up to six hours with normal breaks and sit for up to six hours with normal breaks. (Tr. at 85). Dr. Gaziano additionally found that Claimant was limited to occasional postural activities and should avoid concentrated exposure to vibration or hazards in the work place. (Tr. at 86). In support of his assessment, Dr. Gaziano remarked that Claimant had a normal nerve conduction study; her MRI showed only mild left foraminal stenosis; she had normal motor strength; and she had only moderately limited reflexes. (*Id.*). Thomas Lauderman, D.O., affirmed this RFC assessment on November 12, 2014. (Tr. at 105-07).

### C. Claimant's Statements

Claimant testified at her administrative hearing on October 13, 2016 that she was 5 feet and 7 inches tall and weighed 212 pounds. (Tr. at 38). Claimant noted that she previously weighed 284 pounds, but she believed that she lost weight due to stress, pain, and health problems. (*Id.*). Claimant lived in a home with her spouse and their two children, who were nine years old and ten years old at the time of the hearing. (*Id.*). Regarding her employment history, Claimant stated that she worked for Target from 2009 to 2010 as a nighttime maintenance worker and also had worked as a home health aide caring for elderly individuals. (Tr. at 43-44). Claimant's final job from 2013 to 2014

was as a youth care worker at a children's emergency center, which required her to "restrain" children and "cook and clean up after them." (Tr. at 41). However, Claimant was in a car accident on her way to work on December 31, 2013. (Tr. at 42). Her car was reportedly "totaled" and she injured her back. (Tr. at 42-43). Claimant testified that she began missing work and resigned from her job pursuant to her doctor's recommendation. (Tr. at 43). Claimant conceded that she had back pain prior to her car wreck, but maintained that the car wreck "intensified everything" and her lower back pain seemed to be getting worse over the years. (Tr. at 47).

As to her symptoms and limitations, Claimant testified that she had muscle spasms in her middle and lower back and hips "all the time." (Tr. at 54). She also described having "sharp, stabbing pains" in her back. (Tr. at 55). Claimant stated that her back pain averaged a six or seven on a ten-point scale, but occasionally reached ten on a ten-point scale when she first woke up in the morning. (Tr. at 64). Claimant also mentioned that she had issues with her left shoulder, if she lifted her arm up too high, due to a previous collarbone fracture. (Tr. at 55-56). Furthermore, Claimant stated that she experienced depression, anxiety, and panic attacks, although she was not receiving any mental health treatment. (Tr. at 61-62). Claimant testified that she was no longer taking any prescribed medications or seeing any physicians, mainly due to a lack of transportation. (Tr. at 49, 58). However, Claimant stated that she did take Aleve because it was available over-the-counter. (Tr. at 60-61). Claimant indicated that she needed to use a cane to walk because her left leg would "give out" sometimes, but, since she did not have a cane, she stayed close to walls to keep from falling. (Tr. at 50). Claimant estimated that she fell or stumbled when walking at least three or four times in a two-week period. (Tr. at 57). Claimant stated that she had difficulty sleeping due to pain and could only stand for five minutes at one

time. (Tr. at 51, 66). Claimant also testified that she could not sit for very long due to pain, and she continually shifted positions between standing and sitting. (Tr. at 67).

Claimant was asked to describe her typical daily activities. Claimant responded that she slowly emerged from bed, made coffee, returned to the couch, and saw her children out the door to catch the school bus at 6:30 a.m. (Tr. at 51). Claimant testified that during the day, she mainly tried to relax on the couch and find a comfortable position; she also "tried" to pick up around the house, but was limited in terms of lifting anything and bending. (Tr. at 51-52). Claimant stated that she had five or six "good days" in a 30-day period and, on those days, she could stand at the sink and wash dishes for ten minutes, do laundry, and pick up around the house. (Tr. at 65). She described the remainder of the month as "horrible days" after which she was "just glad that [she] made it to the next day." (Tr. at 66). Claimant acknowledged that she could drive and take showers, but testified that she had to sit down on the edge of the shower if she stood for too long. (Tr. at 51, 53). Claimant attended church services twice per month, participated in Bible study at her home on Saturdays, and attended meetings at her children's school. (Tr. at 53). Claimant also drove herself to her administrative hearing. (Tr. at 59). Claimant stated that the one-hour "ride was rough" due to the condition of the roads, but she made it the whole way without stopping. (Tr. at 59).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) … requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII. <u>Discussion</u>

As noted above, Claimant contends that the ALJ failed to properly consider and incorporate into her RFC the severe physical and mental limitations that she alleges are apparent from her medical record. (ECF No. 9 at 5-7). Claimant points to specific pieces of evidence that focus on her spine impairment, left shoulder pain, anxiety, and affective disorder, which she contends shows that she is not capable of even a limited range of sedentary work. (*Id.*).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the most that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has

21

limitations or restrictions that he or she does not actually have." *Id.* at \*4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at \*7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at \*7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ thoroughly considered Claimant's subjective complaints, daily activities, and the opinion evidence in assessing Claimant's RFC. (Tr. at 22-23, 26). The ALJ also meticulously analyzed Claimant's treatment records, including the specific records which Claimant argues support her allegation of disability. (Tr. at 23-25); (ECF No. 9 at 5-7). The ALJ assessed Claimant's abilities and limitations on a function-by-function basis and constructed an RFC finding unique to Claimant, which accounted for her particular work-related weaknesses. Therefore, the ALJ complied with Social Security rules and regulations in conducting the RFC assessment.

### A. Physical Impairments

In terms of Claimant's spinal disorder and associated symptoms, the ALJ examined Claimant's records from her primary care provider, Dr. Becher, in April and May 2014 and noted that Claimant reported worsening back pain, lumbar radiculopathy, tingling, and numbness and that Claimant exhibited decreased sensation and no patellar deep tendon reflex in her left lower extremity. (Tr. at 23-24). The ALJ cited that Dr.

Becher referred Claimant to a neurosurgeon, Dr. Julien, in May 2014 to evaluate Claimant's lumbar radiculopathy, and Dr. Julien found on examination that Claimant had an antalgic gait, tenderness and muscle spasms in her lumbar spine, restricted and painful lateral flexion and rotation, and a positive straight leg raising test. (Tr. at 24). The ALJ also remarked that Claimant's April 2014 lumbar spine MRI showed small disc protrusions at L4-L5 and L5-S1 and left-sided foraminal stenosis. (*Id.*).

However, in assessing Claimant's RFC, the ALJ considered the entirety of Claimant's medical records, including critical portions of the records that Claimant did not discuss in her brief. For instance, the ALJ noted that Claimant's foraminal stenosis was mild. (Tr. at 24). This finding was supported by substantial evidence, as Claimant's MRI showed only small protrusions and mild degenerative changes and narrowing in Claimant's lumbar spine. (Tr. at 24, 349). Claimant's diagnostic testing did not demonstrate any severe, or even moderate, findings. (*Id.*). In addition, as cited by the ALJ, Claimant's May 2014 nerve conduction study on both of her lower extremities did not show any abnormalities. (Tr. 24, 341).

The ALJ also fully considered Claimant's records from her subsequent primary care provider, Dr. Steele, noting, *inter alia*, that during Claimant's December 2014 visit with Dr. Steele, Claimant had an antalgic, limping gait on her left side; muscle spasms throughout the length of her paraspinal musculature on her left side; a positive straight leg raising test on the left side; and numbness in her left lower extremity. (Tr. at 24). The ALJ also cited that Claimant reported left arm weakness and shoulder pain that Dr. Steele assessed to be most likely a muscle strain. (Tr. at 24-25).

The ALJ acknowledged that Claimant had documented musculoskeletal injuries, but pointed out that even with these impairments, she was not disabled. The ALJ

discussed Dr. Steele's conversation with Claimant in July 2015 when Dr. Steele advised Claimant that she was capable of working despite her low back pain. Dr. Steele refused to write a letter opining that Claimant was disabled; instead, Dr. Steele indicated that she was willing to state that Claimant needed a job that did not require her to be constantly on her feet. (Tr. at 25, 26). The ALJ explained that he specifically compensated for Dr. Steele's proposed limitation in the RFC assessment by restricting Claimant to standing and walking for no more than two hours in a work day. (Tr. at 26). Also, the ALJ considered the fact that Dr. Steele suspected during Claimant's July 2015 visit that Claimant was not taking her medications as prescribed. (Tr. at 25, 438). Thus, Dr. Steele ordered a urine screen, which Claimant failed, and Dr. Steele refused to provide Claimant any more controlled substances in the future. (Tr. at 25, 424).

Finally, the ALJ discussed Claimant's August 2015 visit with physician's assistant, Ms. Allen, at the neurosurgery clinic. (ECF No. 9 at 6). Claimant noted in her brief only that she had diffuse tenderness to palpation in her neck and back at that visit. (*Id.*). The ALJ considered this examination finding in the decision. (Tr. at 25). However, Claimant failed to mention the other results of this examination and her subsequent examination with neurosurgeon, Dr. Marsh, in December 2015, both of which were critical to the ALJ's decision. As cited by the ALJ, during Claimant's August 2015 visit with Ms. Allen and her December 2015 visit with Dr. Marsh, Claimant's straight leg raising tests were negative bilaterally; her gait was normal and tandem; her reflexes were normal throughout her upper and lower extremities, except for her Achilles, which was +1; she did not have any clonus; she had normal muscle tone and strength; and her sensation to touch was intact. (Tr. at 488-89, 491). Dr. Marsh also remarked on Claimant's "lack of effort" during her examination. (Tr. at 489).

Overall, as shown above, the ALJ very clearly considered the evidence cited in Claimant's brief and incorporated significant restrictions in Claimant's RFC to account for such evidence. Claimant fails to identify any critical or conflicting evidence which the ALJ overlooked in assessing her RFC. Furthermore, the ALJ considered the fact that there was no opinion in the record which concluded that Claimant was disabled or that she had greater limitations than those assessed by the ALJ. (Tr. at 26). In fact, as noted by the ALJ, the state agency physicians concluded that Claimant could perform a limited range of work at the light exertional level. (Tr. at 26, 85-86, 105-07). The ALJ accorded the agency expert opinions only partial weight because the ALJ considered additional medical evidence submitted after the agency expert opinions were rendered, considered Claimant's testimony, and, to the extent that it was not inconsistent with the overall record, gave Claimant the benefit of the doubt in terms of her alleged limitations. (Tr. at 26).

Claimant freely asks the Court to independently review the record and find that Claimant is incapable of even a limited range of sedentary work. Claimant contends that "it is obvious" from the record that she incapable of substantial gainful activity at any level on a sustained and consistent basis. (ECF No. 9 at 5). Yet, Claimant does not point to any specific evidence that proves her point, nor does she cite to any legal precedent to show that the ALJ's RFC evaluation is "fatally flawed," as Claimant argues. The role of the court in reviewing an agency's decision is not to conduct independent fact finding and evidence weighing. Specifically, it is not the duty of the court to analyze the record *de novo* and determine whether a claimant is disabled. *Johnson*, 434 F.3d at 653. Rather, the court simply reviews the record to determine if the Commissioner's decision of nondisability is supported by substantial evidence. *Id.* The court must uphold the ALJ's decision if it is

supported by more than a mere scintilla of evidence. *Blalock*, 483 F.2d at 776. While Claimant may disagree with the ALJ's RFC finding, "the determination of a claimant's RFC is ultimately the province of the ALJ as the representative of the Commissioner." *McPherson v. Astrue*, 605 F. Supp. 2d 744, 755 (S.D.W. Va. 2009) (citing 20 C.F.R. § 404.1527(e)(2); *see also Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990)." "The reviewing court's sole responsibility is to determine whether the ALJ's determination of the claimant's RFC is rational and based on substantial evidence." *Id.* (citing *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir.1974)). That standard is very clearly met, even exceeded, in this case.

The record undoubtedly supports the RFC limitations assessed by the ALJ. On various examinations, Claimant exhibited restricted range of motion in her lumbar spine, an antalgic gait, muscle spasms along her spine, and decreased sensation in her left lower extremity. (Tr. at 325, 338, 346, 437, 465, 480). Objectively, Claimant's MRIs showed stable, small disc protrusions in her lumbar spine and mild stenosis, and her nerve conduction study was normal. (Tr. at 341, 349, 458). These clinical signs and symptoms translated into work-related limitations that the ALJ incorporated into Claimant's RFC finding with reduced exertional capacities and restrictions on postural, manipulative, and environmental functions. The record as a whole supports the ALJ's conclusion that Claimant is capable of at least a limited range of sedentary work--which reflects an individual with considerable dysfunction, but who is still able to perform gainful employment on a fulltime basis. Namely, Claimant's own treating physician opined that Claimant could work, if she was not required to be constantly on her feet; agency consultant who reviewed Claimant's records concluded that she could work at the light exertional level; Claimant's diagnostic testing did not show any moderate or severe issues

of any kind; and Claimant's most recent examination with neurosurgeon Dr. Marsh in December 2015 showed that Claimant had normal muscle tone, muscle strength, gait, sensation, and reflexes, other than a mildly diminished Achilles reflex. (Tr. at 488-89). Furthermore, by the time of Claimant's administrative hearing in October 2016, Claimant was taking no medications whatsoever and was no longer under the care of any physician. (Tr. at 49, 58). For all of the above reasons, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's physical impairments complies with the law and is supported by substantial evidence.

### B. Mental Impairments

Claimant next argues that the ALJ failed to discuss the impact of her affective disorder and anxiety on the unskilled sedentary occupational base as required by SSR 96-9p. (ECF No. 9 at 6). Claimant further indicates that the ALJ should have ordered a consultative mental examination to ascertain the nature and severity of Claimant's mental impairments and states that the ALJ should have accepted the testimony of the vocational expert that someone with Claimant's characteristics would be precluded from working if she was absent from work more than one day per month and/or off-task ten percent or more of the workday. (*Id.* at 7).

SSR 96-9p explains that "[a] substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), will substantially erode the unskilled sedentary occupational base and would justify a finding of disability." SSR 96-9P (S.S.A. July 2, 1996), 1996 WL 374185, at *9. The Ruling lists that the following "mental activities are generally required by competitive, remunerative, unskilled work:"

- Understanding, remembering, and carrying out simple instructions.

27

- Making judgments that are commensurate with the functions of unskilled work--i.e., simple work- related decisions.

- Responding appropriately to supervision, co-workers and usual work situations.

- Dealing with changes in a routine work setting.

*Id.*

However, the Ruling unequivocally cautions that "less than substantial loss of ability to perform any of the above basic work activities may or may not significantly erode the unskilled sedentary occupational base." *Id.* Pursuant to the ruling, the "individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience" and when "an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource." *Id.*

In this case, the ALJ made specific findings concerning the mental categories listed in SSR 96-9p. The ALJ concluded that Claimant could:

- Understand, remember, and carry out instructions;

- Perform simple work-related decisions;

- Frequently respond appropriately to supervisors and co-workers and occasionally respond appropriately to the public; and

- Deal with changes in the work setting.

(Tr. at 21). Therefore, the ALJ very clearly considered the SSR 96-9p factors. *See, e.g., Stoddard v. Astrue*, No. 7:11-CV-124-FL, 2012 WL 4498363, at *3 (E.D.N.C. Sept. 28, 2012) (holding that the fact that the ALJ RFC assessment included findings on the SSR

96-9p mental activity categories satisfied SSR 96-9p).

The ALJ did not conclude that Claimant's mental impairments resulted in a substantial loss of ability to perform any of the basic work activities listed in SSR 96-9p. Therefore, in accordance with the Ruling, the ALJ solicited the assistance of a vocational expert to determine the extent to which Claimant's foregoing mental limitations eroded the unskilled sedentary occupational base. The ALJ questioned the vocational expert if any jobs existed in the national economy that could be performed by a person with Claimant's characteristics and RFC, including the foregoing mental limitations. (Tr. at 73-74). The vocational expert identified unskilled sedentary jobs that such a person could perform. (Tr. at 74). Therefore, the undersigned **FINDS** that the ALJ complied with SSR 96-9p in rendering his decision. *See Baldwin v. Colvin*, No. 3:14-CV-00178, 2015 WL 1467050, at *6 (S.D.W. Va. Mar. 30, 2015).

Next, Claimant indicates that the ALJ should have ordered a consultative mental examination to ascertain the nature and severity of her mental impairments. However, an "ALJ's duty to assist in developing the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Lichlyter v. Astrue*, No. 6:11-CV-00597, 2012 WL 4378142, at *2 (S.D.W. Va. Sept. 25, 2012) (citations omitted); *accord Ferrell v. Astrue*, No. 3:11-CV-00503, 2012 WL 4378126, at *2–3 (S.D.W. Va. Sept. 25, 2012). "An ALJ may order a consultative examination when the evidence on the record is insufficient for the ALJ to determine whether the claimant is disabled." *Id.*; *see* 20 C.F.R. §§ 404.1519a, 416.919a; *Powell v. Comm'r, Soc. Sec. Admin.*, No. CIV. SAG-11-790, 2013 WL 2300971, at *1 (D. Md. May 23, 2013) ("A consultative exam is only needed when the evidentiary record before the ALJ is inadequate."); *Welsh v. Comm'r, Soc. Sec.*, No. CIV. JKB-14-3891, 2015 WL

5198658, at *2 (D. Md. Sept. 4, 2015) ("Regulations provide that a consultative examination may be purchased where the ALJ lacks sufficient evidence to reach a conclusion about disability."). "A reviewing court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures are needed in order to accomplish that goal." *Lichlyter*, 2012 WL 4378142, at *2 (citation omitted); *Ferrell*, 2012 WL 4378126, at *2–3.

In this case, there were no evidentiary gaps or questions that mandated the ALJ to order a consultative mental examination. The ALJ considered Claimant's allegations of social anxiety and reported panic attacks, but noted that Claimant ceased mental health treatment in 2014 and was not taking any psychotropic medication. (Tr. at 20, 23). Reviewing the record in this case, Claimant did express some complaints related to anxiety, irritability, and depression to her primary care providers and was treated by Celexa, Effexor, and then Zoloft. (Tr. at 323, 325, 336, 339, 429, 447, 451, 477, 481). However, Claimant was fully oriented and maintained a normal mood and affect during her medical appointments. (Tr. at 437, 450, 480). She was evidently able to routinely attend her medical appointments and interact with her various medical providers without any noted issues. Thereafter, Claimant ceased receiving any mental health treatment. At the time of Claimant's administrative hearing in October 2016, Claimant attributed her restrictions to physical issues and testified that she attended Church twice per month, participated in Bible study at her home on Saturdays, and went to her children's school for meetings. (Tr. at 53). Moreover, the state agency experts concluded that Claimant did not even have severe mental impairments and the ALJ concluded that Claimant had only mild limitations related to her mental impairments, a finding which Claimant does not challenge. (Tr. at 20, 84, 104). Therefore, the undersigned **FINDS** that the ALJ's decision

to not order a consultative mental examination is supported by substantial evidence.

Finally, Claimant argues that the ALJ should have accepted the vocational expert's testimony, which was elicited by her attorney, that a person with Claimant's characteristics and RFC could not work if the person was absent from work more than one day per month or off-task at least ten percent of the workday. (ECF No. 9 at 7); *see* (Tr. at 75). In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

Considering that Claimant did not offer any evidence indicating that she would be

absent from work more than one day per month or off-task at least ten percent of the workday, there was no reason for the ALJ to incorporate such a limitation into the hypothetical questions posed to the vocational expert, or rely on the vocational expert's response to such a hypothetical question. The hypothetical which the ALJ expressed to the vocational expert fairly set forth all of Claimant's limitations for which there was substantial support in the record. Therefore, the undersigned **FINDS** that the ALJ posed a proper hypothetical to the vocational expert and properly relied on the expert's testimony at steps four and five of the sequential evaluation.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 10); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  November 7, 2018

Cheryl A. Eifert
United States Magistrate Judge

33